MARY V. GRAESER, Appellant, v. PHOENIX FINANCE COMPANY of Des Moines, et al., Appellees.

MARY V. GRAESER, Appellant, v. PHOENIX FINANCE COMPANY of St. Louis, et al., Appellees.

No. 42208.

MAY 15, 1934.

REHEARING DENIED DECEMBER 13, 1934.

Howard L. Bump, George W. Graeser, and Allen & Whitfield, for appellant.

Bradshaw, Schenk & Fowler, for appellees.

DONEGAN, J.—The two actions involved in this appeal were brought by the plaintiff, as the owner of certain shares of preferred

stock in the defendant corporations, Phoenix Finance Company of Des Moines and Phoenix Finance Company of St. Louis. These two corporations belonged to what is referred to in the record as the Phoenix group of corporations. This group consisted of seven corporations, all organized under the laws of the state of Delaware and having many of the same persons as owners of their common stock and members of their boards of directors. Six of these corporations were organized for the purpose of carrying on a small short loan business, and the articles of incorporation of each of them were practically the same. The seventh, the Phoenix Finance System, Inc., was a holding company and owned a majority of the common voting stock of all the other corporations. A majority of the common voting stock of the Phoenix Finance System, Inc., was owned by John A. Thompson and his wife, M. K. Thompson, who were president and secretary, respectively, of all the corporations. The name of the Phoenix Finance Company of Des Moines was later changed to Phoenix Finance Company of Ohio, but for convenience this corporation will be referred to in this opinion as Phoenix Finance Company of Des Moines. The capital stock of the Phoenix Finance Company of Des Moines and of the Phoenix Finance Company of St. Louis comprised common voting stock, preferred stock, and participating stock. None of this stock had any par value. The preferred stock drew dividends of $6.00 per annum, was cumulative as to dividends, was preferred as to both earnings and assets, was redeemable at $105 per share, and entitled to receive $105 per share in case of liquidation, dissolution, or winding up of the corporation, together with all dividends accrued, before the holders of any other classes of stock would participate.

In the latter part of 1931, it was proposed that, instead of the seven corporations then existing, the business be taken over by one large corporation and the other corporations be discontinued. Pursuant to such proposal, a new Delaware corporation, being the defendant Phoenix Finance Corporation, was organized, and the assets of each of the other seven old Phoenix corporations were sold and transferred to the new Phoenix Finance Corporation. Seven separate contracts of sale were executed, one by each of the old corporations, and the consideration for the assets sold by each corporation was delivered to such selling corporation. In each sale, the consideration consisted partly of cash and partly of 8 per cent gold bonds and of preferred stock and participating stock in the purchas-

ing corporation. At the time of the sales none of the corporations appears to have been operating at a loss, but in none of them were the assets then sufficient to pay the preferred stockholders in full. The book value of the preferred stock in the Phoenix Finance Company of Des Moines at the time of the sale and transfer was $71.48 per share, and the book value of the preferred stock in the Phoenix Finance Company of St. Louis was $63.13 per share. The amount of cash, bonds, preferred and participating stock of the Phoenix Finance Corporation given in payment to each of the old corporations was based upon the book value of the preferred stock then outstanding in such old corporations.

The Phoenix Finance Company of Des Moines and the Phoenix Finance Company of St. Louis received from the Phoenix Finance Corporation the consideration for the assets sold by each of said corporations respectively. In the case of the Phoenix Finance Company of Des Moines this consideration consisted of $2,740 cash, Phoenix Finance Corporation bond No. 3 for $74,000 of 8 per cent registered bonds, certificate No. 3 for 2,741 shares of preferred stock, and certificate No. 3 for 1,827 shares of participating stock of the Phoenix Finance Corporation. The consideration to the Phoenix Finance Company of St. Louis was $2,617.50 cash, Phoenix Finance Corporation bond No. 5 for $70,000 of the 8 per cent registered bonds, certificate No. 5 for 1,745 shares of preferred stock, and certificate No. 5 for 1,745 shares of participating stock of the Phoenix Finance Corporation. After the bonds and certificates of stock had been received by the selling corporations and receipted for by them, letters were sent to each of the preferred and participating stockholders telling them what had been done, asking them to send in their preferred and participating stock, and stating that they would receive in exchange therefor their proportionate amount of the cash, bonds, preferred and participating stock received from the Phoenix Finance Corporation.

Some time later, letters were sent to the Phoenix Finance Corporation by both the Phoenix Finance Company of Des Moines and the Phoenix Finance Company of St. Louis asking that the single bond and the single certificates for the preferred and participating stock which had been issued to the selling corporations be voided, and that in place thereof the Phoenix Finance Corporation issue numerous certificates to names to be supplied from time to time, but in the aggregate amount totaling exactly the same as had been

tendered. The reason given for this letter is that, by having the bonds and certificates issued directly from the Phoenix Finance Corporation to the holders of the preferred stock in the Phoenix Finance Company of Des Moines and the Phoenix Finance Company of St. Louis, large savings were made in transfer taxes. Both the Phoenix Finance Company of Des Moines and the Phoenix Finance Company of St. Louis adopted resolutions for the cancellation of all of the participating stock and preferred stock in these companies which should be delivered to them by the owners thereof in exchange for their proportionate amount of the cash, bonds, preferred and participating stock of the Phoenix Finance Corporation. At meetings of the common stockholders of said two selling corporations it was resolved that the consideration received for the sale of their assets be distributed among the preferred stockholders in the proper pro rata proportion as a liquidating dividend, and that, when all of the assets of the corporations have been distributed among the preferred stockholders, and all liabilities satisfied, the president and secretary are authorized and instructed to execute and file proper reports, applications, and other instruments necessary to dissolve the corporations.

In 1928, one J. H. Beers became the owner of four shares of preferred stock and four shares of participating stock of the Phoenix Finance Company of Des Moines, and of 5 shares of preferred and 5 shares of participating stock of the Phoenix Finance Company of St. Louis. This stock was owned by him until the time of his death on the 7th day of February, 1932. It appears that in a will left by said Beers his wife was named as the executrix. This will was probated and letters testamentary issued to the widow, Anna M. Beers, as executrix. On August 1, 1932, certificates for the preferred and participating stock which stood in the name of J. H. Beers were indorsed by Anna M. Beers, as executrix, assigning all of the stock represented by such certificates to Mary V. Graeser, the plaintiff herein.

On the 26th day of August, 1932, these actions in equity were commenced by said Mary V. Graeser in the district court of Polk county, Iowa. The relief asked was that the Phoenix Finance Company of Des Moines and the Phoenix Finance Company of St. Louis, respectively, be required to account; that the court fix the value of plaintiff's shares of preferred stock as of January 1, 1932; that the court give plaintiff a judgment against Phoenix Finance Cor-

poration for the value of such stock, and that the amount found due be impressed as a lien upon the assets acquired by said corporation from the Phoenix Finance Company of Des Moines and the Phoenix Finance Company of St. Louis, respectively. The defense, in substance, was that plaintiff had no right to maintain the action, because she was not a stockholder of record in the defendants Phoenix Finance Company of Des Moines and Phoenix Finance Company of St. Louis; that the sales and transfers were made pursuant to the provisions of the laws of the state of Delaware under which the defendant corporations had been organized; and that the determination of the issues involved required an interference with the internal affairs of the defendant corporations and the exercise of visitorial powers, and the courts of this state should not, therefore, assume jurisdiction. The two cases were consolidated and tried together, and the district court entered a decree dismissing both cases and assessing the costs to the plaintiff. From this decree and judgment the plaintiff appeals.

At the outset, we are met with the appellees' contention that the plaintiff-appellant has no right to maintain this action, because she is not a stockholder of the defendant corporations. It is undisputed that all the shares of which plaintiff claims to be the owner were owned by J. H. Beers until the time of his death, and that plaintiff's ownership is based upon the assignment of said shares of stock to her by Anna M. Beers, executrix of the estate of said J. H. Beers. It further appears without question that no transfer of the shares of stock represented by said certificates has ever been made on the books of the corporations, and that no request for such transfer was made by the plaintiff-appellant prior to the trial of these cases. The articles of incorporation of both the Phoenix Finance Company of Des Moines and the Phoenix Finance Company of St. Louis provide that transfers of stock can be made only on the books of the corporation by the surrender of the old certificate properly indorsed; and that the corporation shall be entitled to treat the holder of record as owner and shall not be bound to recognize any equitable claim or other interest in any share upon the part of any other person, whether or not it shall have express or other notice thereof. The laws of the state of Delaware provide that shares of stock in a corporation are personal property and transferable on the books of the corporation in such manner and under such regulations as the by-laws provide.

It is a rule so well recognized as to require the citation of no authority that, even though the statutes and the articles of incorporation require a transfer of the stock to be made upon the books of the corporation before it will be binding upon the corporation, this does not prevent the assignee of certificates of stock from becoming the equitable owner. It is equally well settled that the equitable owner of stock, by assignment of the certificate without transfer on the corporate records, cannot demand dividends, cannot, in the case of voting stock, exercise a right to vote at a stockholders' meeting, and cannot exercise many other rights of a stockholder. The question here involved, however, is whether the plaintiff, as such equitable owner, without having acquired the legal title by the transfer of the certificates of stock upon the books of the corporation, has the right to maintain these actions against the defendant corporations. There seems to be very little direct authority on the precise proposition with which we are here concerned, and this little is not altogether harmonious and does not give us much light. In 14 C. J. 753, it is said:

"Under a provision requiring a transfer of stock to be made on the books of the corporation, an unregistered transfer passes to the transferee, as against the corporation, only an equitable title, and confers on him, as against the corporation, no rights except that of having the stock properly transferred to him on the books of the corporation, or of *suing to establish and protect his rights in the corporate property,* such as against the corporation in committing ultra vires acts, or in disposing of or dissipating the corporate assets." (Italics ours.)

From the above it appears that the assignee of certificates of stock which have not been transferred upon the books of the corporation does have the right, as against the corporation, to sue to establish and protect his rights in the corporate property. In Brown v. Duluth, M. & N. Ry. Co. (C. C.) 53 F. 889, which is cited in a note referred to in the above quotation from Corpus Juris, there was a suit by plaintiff claiming to be stockholder to restrain a corporation from ultra vires acts, and the court said:

"Has he (plaintiff), on the facts stated in the original or amended complaint, the right, as a stockholder, to institute this suit to restrain the corporation from alleged ultra vires and illegal acts? A membership in this corporation consists in the ownership of shares

thereof recognized by the corporation. The complainant claims membership by acquiring corporate stock by transfer, but, not having registered his stock, and obtained recognition by the corporation as a stockholder, he can claim no other rights than those which the assignment vests in him. Undoubtedly, as between himself and his assignors, the purchase of the certificate gives him all the rights of ownership, and entitles him to demand that he shall be registered by the corporation; but, until he has caused a transfer to be made upon the books of the corporation, his title, as between the corporation and himself, is not perfected, and he neither has the rights nor is subject to the liabilities of membership. He may bring a suit, under some circumstances, *to protect his individual interests in the corporate property*, but he cannot participate in the management of the corporation and enforce corporate rights to restrain threatened wrongs on the corporate interests. He brings this suit in behalf of himself and his associate stockholders. Not being a stockholder himself recognized by the corporation, he is personally precluded from doing this." (Italics are ours.)

The case of Becher et al. v. Wells Flouring-Mill Co. (C. C.) 1 F. 276, was an action brought by plaintiffs claiming to be stockholders in defendant corporation, asking that the corporation and other defendants be enjoined from holding a meeting for the purpose of increasing the debt of the corporation. Plaintiffs were holders of shares of defendant corporation's stock by assignment from the original holders, but transfer of the stock had not been made upon the books of the corporation. The court said:

"The mere assignment gives the assignee an equitable title only, except as against the assignor. The certificates do not constitute property in the corporation; they are the muniments of title, but it is the shares of stock which constitute the property, and the persons whose names appear upon the books of the corporation are presumed to be the stockholders; they have the right to vote and participate in directing the policy of the company. The corporation has not recognized the complainants as stockholders, and thus waived any right to require such registry, and the affidavits read on the hearing do not make it clear that a demand for the transfer of the stock was ever made. If it was, and there was a refusal to comply, legal proceedings would undoubtedly secure to the complainants the proper relief."

In Fitchett v. Murphy, 46 App. Div. 181, 61 N. Y. S. 182, which was an action brought by minority stockholder of American Bill Posting Company to restrain defendants from paying to themselves certain salaries claimed to be exorbitant, the court said:

"In the next place, there seems to be a fatal defect in the plaintiff's case, both in her pleading and in her proof. Her cause of action is derivative. Alleging misconduct of the defendants, even during her intestate's life, did not give him any personal claim which, as property, could pass to his administratrix. To bring an action of this kind, a person *must be a stockholder at the time of the institution of the action.* The right of action is incident to the ownership of the stock, for it is to compel a restoration of property acquired through a past wrong on the corporation, not on the stockholder individually, or to prevent future injury to the corporation, that such an action is maintainable. The allegations of the complaint are that the husband was a stockholder 'up to about the 1st day of May, 1897,'—a period of one month before his death. It is not alleged that he was the owner and holder of the stock at the time of his decease, or that the plaintiff, as his administratrix, is such owner; nor does the plaintiff offer any testimony to supply this defect." (Italics are ours.)

The certificates for the shares of stock involved in this case were never presented to the proper officers for transfer on the books of the corporation. Upon the trial of the case, the attorney for the appellant tendered such certificates to the attorney for the appellees. Appellees contend that this tender, not being to the proper officer of the corporation, was not sufficient to entitle appellant to a transfer on the corporation records, and that, in any event, the plaintiff did not have the right to maintain the action until the transfer actually had been made upon the books of the corporation. We are not prepared to say that the contentions of the appellees are altogether without merit. Under the authorities above quoted, there are undoubtedly some causes of action which the appellant could not maintain against the defendant corporations until the shares of stock which she claims to own were transferred to her name on the corporate records. But, under these authorities, even without such transfer to her on the corporate records, she can maintain a suit to establish and protect her rights in the corporate property. Even if there may be some doubt as to whether the actions at bar involve such rights in the

corporate property, we would not feel justified in dismissing them without a consideration on the merits.

The vital proposition involved in this case is whether the plaintiff as a dissenting stockholder has the right to be paid the value of her stock in cash. Whether a dissenting stockholder has the right to be paid the cash value of his stock, where the assets of a corporation are taken over by another corporation, depends on whether the common-law rule or statutory provisions are to be applied to the transaction. At common law it is the rule that neither the board of directors nor any number of stockholders can dispose of all the assets of a corporation which is conducting a prosperous business, against the dissent of even a single stockholder. Where, however, a corporation is insolvent or its business is being conducted at a loss, a majority of the stockholders may, in the absence of fraud, compel a sale of all its assets, even though a minority of the stockholders is opposed to such disposition. 14 C. J. 866, and cases cited. In many states, however, statutes have been enacted which supersede the common-law rule and authorize the disposition of all the assets of a corporation by a majority or a certain percentage of the stockholders, regardless of whether the corporation is in a prosperous condition or not.

The corporations involved in this case are all Delaware corporations and are, of course, controlled by the provisions of the Delaware statutes so far as applicable. The appellant contends that the provisions of the Delaware statutes were not followed by the majority stockholders in disposing of the assets of the St. Louis and Des Moines corporations, and that the rights of the dissenting stockholders are controlled by the rule of the common law. In order to avoid confusion of terms, it may be well to consider the difference between a consolidation and a merger on one hand, and a sale of assets on the other. In 14a C. J. 1054, it is said:

"The term 'consolidation' is an elastic one and may include a union of two or more corporations into a new one with a different name with or without extinguishing the constituent corporations, or the merging of two or more corporations into one existing corporation under the name of the latter."

As to the distinction between consolidation and merger, it is further said:

"A true consolidation, which exists where a new corporation springs into existence to assume the liabilities of the former corporations and the prior corporations are dissolved and cease to exist, should be distinguished from a merger which exists where one corporation is continued and the others are merged in it without the formation of a new corporation; * * * from a mere sale of the property and franchises of one corporation to another. * ' * * "

In the case at bar the assets of the Des Moines and St. Louis Companies were taken over by a new corporation, and it is apparent that, so far as the technical distinction between consolidation and merger is concerned, the transaction involved was not a merger. Whether it was a consolidation, as contended by the appellant, or a mere sale of property and assets by the old corporations to a new corporation, in accordance with the statutes of Delaware, as contended by appellees, is a proposition to which we will now direct our attention.

Appellant, in her brief and argument, quotes the definition of consolidation which is found in 15 Fletcher on Corporations (New Ed.) section 7041, which is as follows:

"Taking up first the matter of consolidation, it should be observed that the term, when accurately used, has a definite legal meaning. It is a combination by agreement between two or more corporations of the same or different states, and under authority of law, by which their rights, franchises, privileges and property are united, and become the rights, franchises, privileges and property of a single corporation, composed generally, although not necessarily, of the stockholders of the original corporations. Strictly speaking, a consolidation signifies such a union as necessarily results in the creation of a new corporation, and the termination of the existence of the old ones."

She also refers to the definition set out in State v. Montana R. Co., 21 Mont. 221, 53 P. 623, 45 L. R. A. 271, which says that consolidation is the dissolution of corporations and at the same instant the creation of a new corporation with property, liabilities, and stockholders derived from those passing out of existence.

She also quotes the statement contained in Philadelphia W. & B. R. Co. v. Howard, 13 How. 307, 14 L. Ed. 157, which says that a consolidation takes place where two or more existing corporations

are united into a single corporation, and the existence of the uniting corporations is terminated and the organization succeeds in a general way to the franchises and acquires the property and assets and assumes the debts and obligations of the constituent companies. It will be noted that in each of these definitions of consolidation the franchises of the old corporations are taken over as well as the property, and in two of them it is expressly stated that the existence of the old corporations is terminated. Appellant contends that in this case there was a consolidation because what it was intended to accomplish and what the measures used did accomplish resulted in the dissolution of the old Phoenix corporations and the creation of a new corporation with the same stockholders (both common and preferred), the combined assets and liabilities, the same officers and directors as controlled the old companies. We think this reasoning is unsound, and that the conclusion reached does not necessarily follow. This argument confuses the result with the means used to produce it. Where the same result may be reached by different means or methods, the proof of the result certainly does not prove which of the different means or methods was used to produce it.

The statutes of the state of Delaware provide both for a merger or consolidation and for a sale of assets. The statutes authorizing a merger or consolidation clearly contemplate that in such case the shares of stock of each of the constituent corporations shall be converted into shares of the consolidated corporation, and that, when the agreement of consolidation is signed, acknowledged, filed, and recorded, the separate existence of all of the constitutent corporations, or of all of such constituent corporations except the one into which the constituent corporations have been merged, as the case may be, shall cease. These statutes also provide the conditions under which a dissenting stockholder of any of the constituent corporations may demand the cash value of his shares. The statute in reference to the sale of assets is entirely distinct from those having reference to merger or consolidation, and is as follows:

"Every corporation organized under the provisions of this Chapter, may at any meeting of its Board of Directors, sell, lease or exchange all of its property and assets, including its good will and its corporate franchises, upon such terms and conditions and for such consideration, which may be in whole or in part shares of stock in, and/or other securities of, any other corporation or cor-

porations, as its Board of Directors shall deem expedient and for the best interests of the corporation, when and as authorized by the affirmative vote of the holders of a majority of the stock issued and outstanding having voting power given at a stockholders' meeting duly called for that purpose, or when authorized by the written consent of the holders of a majority of the voting stock issued and outstanding, provided, however, that the Certificate of Incorporation may require the vote or written consent of the holders of a larger proportion of the stock issued and outstanding."

It is admitted by the appellees that the transactions involved in this case were not intended to be and were not pursuant to the provisions of the Delaware statutes for a merger or consolidation. We are obliged to determine, therefore, whether what was done in this case was a consolidation pursuant to common law, as claimed by appellant, or whether, as claimed by appellees, it was a sale of assets as authorized by the Delaware statute. This must be determined from the evidence presented in the record. As the evidence is quite voluminous and consists very largely of documentary evidence, it is impossible to set it out in detail. We can only state our conclusions as to what we think this evidence fairly shows.

We think the evidence fairly shows that, while the plan pursued contemplated the ultimate dissolution of the old Phoenix Corporations, this was not inconsistent with the sale of their corporate assets to the Phoenix Finance Corporation, in accordance with the provisions of the Delaware statute. Separate offers of sale were made by the Phoenix Finance Company of St. Louis and Phoenix Finance Company of Des Moines after the voting common stockholders of these corporations had authorized such action, and these offers were accepted by the Phoenix Finance Corporation by separate resolutions as to each of the offers. Separate agreements of sale and transfer of their assets were entered into pursuant to the resolutions passed by the respective boards of directors of the St. Louis and Des Moines companies after they had been authorized to make such agreements by the majority of the common voting stockholders. Under the agreements thus made, the cash, stock, and securities of Phoenix Finance Corporation, which were given in exchange for the assets of the St. Louis and Des Moines companies, became the property of these respective companies, and these corporations did not cease to exist, as would be the necessary result of a con-

solidation, but still continued in existence as corporate entities. While the petition alleged fraud, we do not think the evidence supports such allegation. The record shows that all stockholders were advised of the proposal to place the business of all the corporations in a single corporation, and were asked to express their attitude, before any action was taken; that the holders of the common voting stock were also holders of much more than a majority of the preferred and participating stock in the subsidiary corporations; that the consideration delivered to each of the subsidiary corporations was based on the total value of the preferred stock of such corporation; that the proportion of the assets of the subsidiary corporations which their preferred stockholders would receive on distribution was based upon the amount of the preferred stock held by them in the respective subsidiary corporations; and that an overwhelming majority of the preferred stockholders in each of the subsidiary corporations expressed their approval of the plan proposed.

It appears from her petition and is plainly stated by the appellant in her brief and argument that this is not a suit to enjoin or to set aside the transaction, but is simply a suit to recover the value of the preferred stock held by her in the subsidiary corporations. The rights of the appellant as a holder of preferred stock in the St. Louis and Des Moines companies must, in the first place, be determined by the contract between her and these corporations. Under well-recognized rules, the provisions of the articles of incorporation and of the laws of the state of its domicile enter into and become a part of the contract between the stockholder and the corporation. 14 C. J. 535; 1 Fletcher on Corporations (2d Ed.) section 164, p. 541; Ontjes v. Bagley, 217 Iowa 1200, 250 N. W. 17; Traer v. Lucas Prospecting Co., 124 Iowa 107, 112, 99 N. W. 290; Peters v. United States Mortgage Co., 13 Del. Ch. 11, 114 A. 598; Jones v. Missouri-Edison Electric Co. (C. C. A.) 144 F. 765, 770. Section 82 of the Delaware General Corporation Law provides that:

"This chapter and all amendments thereof shall be a part of the charter of every such corporation except so far as the same are inapplicable and inappropriate to the objects of such corporation."

Both the certificate of stock held by plaintiff and the articles of incorporation of the Des Moines and St. Louis companies provide that the voting common stock shall exclusively possess all voting power; that the holders of preferred and/or of participating

stock shall have no voting power or be entitled to receive notice of any meeting of stockholders. Section 64A of the General Corporation Law of the state of Delaware, above set out, provides that any corporation may at any meeting of its board of directors sell, lease, or exchange all of its property and assets, including its good will and its corporate franchises upon such terms and conditions and for such consideration which may be in whole or in part shares of stock in and/or securities of any other corporations, as its board of directors shall deem expedient and for the best interests of the corporation, when and as authorized by the affirmative vote of the majority of the stock issued and outstanding. The articles of incorporation provide that:

"In furtherance and not in limitation of the powers conferred by statute the Board of Directors is expressly authorized: * * * To sell, assign, transfer, convey and otherwise dispose of the whole or substantially the whole of the property, assets, effects, franchises and good will of this corporation on such terms and conditions as they shall deem advisable," and authorizes the corporation "to buy, acquire, deal in and transfer shares of capital stock, bonds, debentures, or other securities issued or created by any other corporation."

We think that the sales of the assets of the St. Louis and Des Moines companies to the Phoenix Finance Corporation were fully authorized by the Delaware law and the provisions of the articles of incorporation, and that, under her contract with the corporations, as evidenced by her certificates of stock, of which the laws of Delaware and the articles of incorporation must be considered a part, these sales were binding upon both the selling corporations and the purchasing corporation. As there was no fraud in the transactions, the purchasing corporation acquired a good title to the assets of the selling corporations purchased by it, not only as against these corporations, but also as against their stockholders.

In the case of Stephenson v. Commonwealth & Southern Corporation, 19 Del. Ch. 447, 168 A. 211, a statute provided that:

"If any stockholder in either corporation consolidating as aforesaid, who objected thereto in writing, shall within twenty days after the agreement of consolidation has been filed and recorded, as aforesaid, demand in writing from the consolidated corporation payment of his stock, such consolidated corporation shall, within

three months thereafter, pay to him the value of the stock at the date of consolidation. * * * "

The plaintiff in that case made no objection in writing before the agreement of consolidation was made, but, within twenty days after the agreement was recorded, he did file a demand in writing for the payment of his stock. In refusing to grant such demand the court said:

"As the Chancellor has so clearly shown, there are two conditions which must be satisfied before the right to payment in cash for shares of stock can arise. First, there must be an objection in writing; second, a demand in writing for the payment of stock within twenty days after the agreement of consolidation or merger has been filed and recorded."

In Johnson v. C. Brigham Co., 126 Me. 108, 136 A. 456, there was involved a sale of the entire property of the corporation under a statute which provided that "any minority stockholder who voted in the negative on the proposition of selling may, after the filing of written dissent, if the corporation does not petition, himself petition for the corporation to pay the value of his shares, as the same shall be judicially determined." The plaintiff, who was a stockholder, was not present at the stockholders' meeting at which the vote was taken to sell the property of the corporation. Afterwards, he filed a written dissent and petition to have his shares paid. The court, in sustaining the dismissal of the petition, said:

"The primal requisite of the statute is a vote which refused assent. This essential condition the petitioner did not meet.

"When a right is created by statute, and a specific remedy is provided, the right can be vindicated in no other way than by pursuing the prescribed course, step by step.

"It was proper to dismiss the petition."

In Allied Chemical & Dye Corporation v. Steel & Tube Co. of America, 14 Del. Ch. 1, 120 A. 486, there was involved a sale under the provisions of section 64a of the General Corporation Law of Delaware, the same section involved in this case, and the court, although granting relief on other grounds, in discussing the provisions of this section, said:

"The Steel & Tube Company of America was organized under the General Corporation Law of this state and is, therefore, subject

to the provisions of the above section 64a, which had been written into the law prior to its incorporation. Every stockholder who owns its stock holds it with the condition that at any time the corporate assets may all be sold when the provisions of the statute are complied with.

"In reading this statute it will be observed that two things with respect to a sale are contemplated, viz: (a) an authorization of sale by the stockholders, and (b) a fixing of the terms and conditions by the directors. With respect to the latter, the directors must determine upon such terms and conditions as they 'deem expedient and for the best interests of the corporation.' Thus the right of the directors to define terms and conditions of sale is circumscribed by a discretion which must consult not only expediency, but as well the best interests of the corporation."

In Geiger v. American Seeding Mach. Co., 124 Ohio St. 222, 177 N. E. 594, 79 A. L. R. 614, there was involved a sale of a corporation's assets under a statute which provided that such sale might be made when approved by more than three-fourths of the stockholders, but which contained the further provision that any shareholder who voted against the proposal, and any shareholder who was absent or who was not entitled to vote, might object in writing within twenty days after the vote authorizing such action and at that time demand in writing the payment of the fair cash value of his shares. One stockholder, named Keifer, as trustee, made such objection. Other minority stockholders, including the plaintiff, failed to object. The contract provided that the selling corporation was to receive for the sale of its corporate assets a number of shares in the purchasing corporation "on the basis of one share of such convertible participating stock for each of the 21,440 shares of the preferred stock of the vendor outstanding and one share of such common stock for each two of the 44,088 shares of common stock of the vendor outstanding." An action was commenced to enjoin the distribution of the proceeds of the sale to the common stockholders until the preferred stockholders were paid the par value of their stock. Mr. Justice Marshall, in his opinion, says:

"It will be observed that that section only makes provision for sale of assets and that it contains no provision relating to distribution among stockholders. No other provision of the corporation

code at that time made any specific provision for distribution, other than that required by the articles of incorporation. * * *

"The contract of sale is governed by sections 8623–65 and 8623–72, and that contract having been approved by more than three-fourths of the stockholders became a binding obligation upon the corporation, and all of the preferred stockholders who did not consent thereto, except William W. Keifer, as trustee, are concluded thereby. As to the sale, section 8623–72 is an exclusive remedy for the minority stockholders. As a result of the objection of Keifer, trustee, and his notice given within 20 days, he is entitled to claim the fair cash value of the shares of preferred stock owned by him, to be determined in the manner set forth in the statute. As a result of the failure of the other plaintiffs in this action, who did not make an objection and did not give the notice within 20 days, they are not entitled to receive cash, but are only entitled to their proportionate share of the stock of the Delaware corporation which was paid to the Ohio corporation in return for the conveyance of the assets of the Ohio corporation."

We think that the assets of the Des Moines and St. Louis companies were transferred to the Phoenix Finance Corporation pursuant to the provisions of the Delaware statute; that there was no fraud or unfairness in the transactions; and that, so far as the sales and transfers are concerned, they are binding on the selling corporations, upon the purchasing corporation, and upon their stockholders. This being true, we are unable to see how, in any event, the appellant has any claim against the defendant Phoenix Finance Corporation.

Whether the appellant might have had claims against the Phoenix Finance Company of Des Moines and the Phoenix Finance Company of St. Louis for the cash value of the preferred shares of stock held by her in these companies, we do not think it necessary to determine on this appeal. If the owner of the shares of stock now held by her was ever entitled to make such claim, we think there is some merit in appellees' contention that such rights have been lost by the failure to timely assert the same. The record shows that in November and December, 1931, letters were sent to J. H. Beers, the then owner of said shares of stock, apprising him of the proposed plan and asking for an expression of an opinion from him. No such expression was ever obtained. Beers died February 7, 1932,

and, although a letter addressed to him on February 18, 1932, containing information as to the proceedings which had taken place, was received by his widow and executrix, no word was received from her until, in a letter dated April 16, 1932, she stated that she would like to have the cash for the shares held by her, as she did not care to have the bonds to look after. A reply was immediately sent to her telling her that the purchase of their stock by the corporations would have a tendency to tear down the capital structure, and again suggesting that she send in her shares for exchange. No further word was received from her by the corporations in which she held the stock, and, on August 1, 1932, the certificates representing this stock were assigned to the plaintiff herein.

While the corporations undoubtedly owed certain duties to their stockholders, we think that, under the circumstances of these cases, the stockholders might fairly be said to owe some duty to the officers who were trying to decide on a course of action. The evidence clearly shows that the conditions were such that the plan of discontinuing the old corporations and placing all the business in one corporation was a reasonable one, and that, having asked for an expression of the attitude of the stockholders in reference to it, the officers of the corporation had a right to expect that, where no objection was made, the plan suggested would not later be opposed, and that the stockholders who made no objection would not expect to receive any different consideration than those who had approved the plan.

 Even if the plaintiff and her assignor of the stock in question were not guilty of laches, we think that the question as to appellant's rights, if any, to be paid the cash value of her stock should not be determined by the courts of this state. The only assets owned by the Des Moines and St. Louis companies, after the sales and transfers, were the cash, bonds, and stocks of the Phoenix Finance Corporation which had been obtained as consideration for such transfers. If appellant were to be paid the cash value of her stocks as of the date of the sales and transfer, it is quite possible, and perhaps even probable, that the other stockholders in the Des Moines and St. Louis companies will not receive an equal share of the assets of these corporations on distribution. It seems to us that the determination of any right of appellant to receive cash for her stocks may necessarily affect the rights of other stockholders upon distribution of the assets of these corporations, and such other stock-

holders are not before the court in these actions. The law seems well settled that the courts of one state will not exercise jurisdiction in the internal affairs of a foreign corporation. 14a C. J. 1327, and cases cited. Boyette v. Preston Motors Corporation, 206 Ala. 240, 89 So. 746, 18 A. L. R. 1376; Hogue v. American Steel Foundries, 247 Pa. 12, 92 A. 1073, 1074; Wallace v. Motor Products Corp. (D. C.) 15 F. (2d) 211, 213; Id. (C. C. A.) 25 F. (2d) 655; Rogers v. Guaranty Trust Co., 288 U. S. 123, 129, 53 S. Ct. 295, 77 L. Ed. 652, 656. We believe that the relief sought by appellant as to her rights against the Des Moines and St. Louis companies would require interference in the internal affairs of these companies, and that, for this reason, the courts of this state should decline to act.

Nothing said in this opinion shall be construed as in any way prejudicing the rights of plaintiff-appellant to prosecute any cause of action she may have in the courts of Delaware or elsewhere.

In our opinion, the trial court properly dismissed the petitions, and the decree and judgment from which this appeal was taken is therefore affirmed.—Affirmed.

CLAUSSEN, C. J., and EVANS, STEVENS, ALBERT, MITCHELL, ANDERSON, and KINTZINGER, JJ., concur.